**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

CARA MARIE ZEVENBERGEN,

        Plaintiff,

vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

        Defendant.

No. C14-4028-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING JUDICIAL
REVIEW OF DENIAL OF SOCIAL
SECURITY BENEFITS**

———————————

**TABLE OF CONTENTS**

I.     **BACKGROUND**..................................................................... 2

II.    *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF* ......... 3

III.   *THE ALJ'S FINDINGS* ...................................................... 6

IV.   *THE SUBSTANTIAL EVIDENCE STANDARD* ................................... 8

V.    **DISCUSSION**..................................................................... 9
      A.   *Severity of Mental Impairments* ............................................. 10
           1.   *Applicable Standards* ................................................. 10
           2.   *Medical and Opinion Evidence* ........................................ 11
           3.   *The ALJ's Findings* .................................................. 18
           4.   *Analysis* .............................................................. 19
      B.   *Evaluation of Subjective Allegations* ......................................... 24
           1.   *Applicable Standards* ................................................. 24
           2.   *The ALJ's Findings* .................................................. 26
           3.   *Analysis* .............................................................. 29
      C.   *Hypothetical Question to the Vocational Expert* ........................... 33
           1.   *Applicable Standards* ................................................. 33
            2.   *The question*.......................................................... 33
           3.   *Analysis* .............................................................. 34

VI.   *CONCLUSION* ................................................................. 35

This matter is before me pursuant to Cara Zevenbergen's application for Disability Insurance Benefits under Title II of the Social Security Act ("Act"), and Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. § 401 *et seq*. Zevenbergen seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for benefits. Zevenbergen contends that the administrative record (AR) does not contain substantial evidence to support the Commissioner's decision that she was not disabled during the relevant period of time.

## I.    BACKGROUND

At the time of the hearing, Zevenbergen was 33 years old. She is not married and lives with her boyfriend in Sioux City, Iowa. She has children, but her parental rights have been terminated. Zevenbergen has a twelfth grade education and limited work history, which includes restaurant work and as a clerk at a Goodwill store.

As stated above, Zevenbergen brought this action pursuant to 42 U.S.C. § 405(g), for review of a final decision denying her claim for benefits under Titles II and XVI of the Act. *See* 42 U.S.C. §§ 416(i) & 423, 1382c (a)(3). Plaintiff applied for benefits on October 3, 2011, alleging a disability onset date of October 13, 2008, due to mental impairments. She was last insured for Title II benefits on September 30, 2011; therefore, she has to prove disability before that date to be eligible for Title II benefits. *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998). After a hearing on March 4, 2013, the ALJ denied Zevenbergen's claim on March 22, 2013. Plaintiff filed a request for review, which the Appeals Council denied on March 19, 2014. The Plaintiff filed the present appeal on April 10, 2014. On September 30, 2014, Judge O'Brien held a hearing on

Zevenbergen's case. Unfortunately, Judge O'Brien passed away prior to ruling. Zevenbergen's case was reassigned to me on August 20, 2015. I have reviewed the parties' filings, along with the audio recording of the hearing, and now enter the following.

## II. DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is

3

not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question

defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must show not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove

disability remains on the claimant.  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## III.    THE ALJ'S FINDINGS

In this case, the ALJ applied the appropriate methodology and found:

(1)    The claimant has not engaged in substantial gainful activity since October 13, 2008, the alleged onset date (20 C.F.R. § 416.971 *et seq.*).

(2)    The claimant has the following combination of severe impairments, bipolar disorder, depressive disorder, anxiety disorder, and a history of alcohol abuse.  (20 C.F.R. § 404.1520(c) and § 416.920(c)).

(3)    From the protective filing date of the application, July 18, 2011, until February 17, 2012, the onset date of her sobriety, the claimant's substance use disorder was a contributing factor material to disability.

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§§§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)    Claimant's mental impairments did not meet either "paragraph B" criteria or the "paragraph C" criteria as set out in 20 C.F.R.  Part 404, Subpart P, Appendix 1 (20 C.F.R. §§§ 416.920(d), 416.925 and 416.926).

(6)    Claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She could perform routine and repetitive unskilled work at the SVP 1-2 level that would not require extended concentration or attention and would not deal with goal setting.  In addition, social interaction would be limited

6

to brief and superficial contact with co-workers and supervisors, occasionally. She should avoid intense or frequent social interaction with co-workers and public.

(7)    Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(8)    The testimony of Zevenbergen's boyfriend, Mr. Blowe, was not entitled to great weight.

(9)    The claimant was non-compliant with medication.

(10)   The claimant's allegedly disabling impairments were present at approximately the same level of severity during the periods that she worked.

(11)   Claimant's primary care provider was a nurse practitioner who is not an acceptable medical source.

(12)   The nurse practitioner's conclusion about claimant's condition is not supported by the nurse practitioner's own notes and records.

(13)   The assessments of the state agency medical consultants were entitled to substantial weight because they are acceptable medical sources and their opinions are consistent with the record as a whole.

(14)   Claimant could return to past relevant work.

(15)   As an alternate Step 5 finding, based on the testimony of the vocational expert, and considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

(16)   The claimant was not under a disability, as defined in the Social Security Act, from October 13, 2008,

through the date of this decision (20 C.F.R. §
404.1520(f) and 20 C.F.R. § 416.920(f)).

AR 13-26.

## IV.    THE SUBSTANTIAL EVIDENCE
## STANDARD

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit Court of Appeals explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## V.    DISCUSSION

Zevenbergen contends the ALJ's decision is flawed for three reasons:

     1.     The ALJ erred in failing to find that Zevenbergen has marked difficulties in social functioning and concentration, persistence, or pace.

     2.     The ALJ erred in finding that Zevenbergen's testimony was not fully credible.

     3.     The ALJ relied on incorrect hypothetical questions to the VE. docket no. 12.

### A.    Severity of Mental Impairments

#### 1.    Applicable Standards

At Step Two, the ALJ must consider whether a medically determinable impairment is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is one which "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; capacities for seeing, hearing and speaking; understanding, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). If the impairment would have no more than a minimal effect on the claimant's ability to work, it is not severe. *Page*, 484 F.3d at 1043.

It is the claimant's burden to establish that his or her impairment or combination of impairments is severe. *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." *Kirby*, 500 F.3d at 708 (internal citation omitted). When a claimant has multiple impairments, "the Social Security Act requires the Commissioner to consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling." *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

"Some of the factors an ALJ may consider when determining a claimant's mental impairments are (1) the claimant's failure to allege mental impairments in his complaint, (2) failure to seek mental treatment, (3) the claimant's own statements, and (4) lack of medical evidence indicating mental impairment." *Partee v. Astrue*, 638 F.3d 860, 864

(8th Cir. 2011). The mere presence of a mental disorder does not automatically indicate a severe disability. *Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990). When considering a claimant's own complaints, the ALJ is required to explicitly discredit a claimant and provide reasons. *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) ("[A]n ALJ who rejects such [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints.").

In determining whether a claimant's mental impairments are "severe," the regulations require the ALJ to consider "four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitations: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). If the degree of limitation in the first three functional areas is "none" or "mild" and there are no episodes of decompensation, then the ALJ should conclude that it is a non-severe impairment unless the evidence indicates otherwise. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).

### 2. *Medical and Opinion Evidence*

This case presents a relatively sparse medical record. Therapy records begin in 2007 from Siouxland Mental Health Center, where Zevenbergen began treating to deal with adjustment disorder and to learn proper parent/child relations. On May 14, 2007, Zevenbergen saw Bobbie Meister, MSW/LISW (Masters in Social Work and Licensed Independent Social Worker, respectively), to begin working on her parenting issues. Zevenbergen discussed being tired and upset. AR 312. Meister noted Zevenbergen had a neutral mood and affect, with no abnormalities reported regarding appearance, speech, activity, suicidal ideation, or delusional thinking. *Id.* The next month, Zevenbergen saw

Karen Stoos, ARNP, who diagnosed Zevenbergen with major depressive disorder.[1] Nurse Stoos assigned Zevenbergen a GAF score of 60.[2] Zevenbergen continued monthly meetings with Bobbie Meister through the summer of 2007, with the goal of improving her parenting skills. AR 316-319. Meister noted no significant change in Zevenbergen's mental condition. *Id.* Zevenbergen had a follow up appointment and medication check with Nurse Stoos in August, 2007. AR 321-22. Nurse Stoos noted no changes and again assigned Zevenbergen a GAF score of 60. *Id.*

Zevenbergen did not follow up with Meister between September 2007 and February 2008. On February 18, 2008, Zevenbergen saw Meister for a regular therapy session. Meister noted that Zevenbergen had "no significant medical history" and "no current physical problems or health problems." AR 324. Meister noted that Zevenbergen's only medication was the Lexapro prescribed by Nurse Stoos, and that her primary diagnosis was major depressive disorder. *Id.*, at 325. On that same date, Zevenbergen had a medication check with Nurse Stoos. Zevenbergen complained of difficulty in her home life. Nurse Stoos assigned her a GAF score of 55 and increased

---

[1] Nurse Stoos had previously seen Zevenbergen, as her medical note indicates that Nurse Stoos had first prescribed Zevenbergen the depression medicine Lexapro on December 18, 2006. AR 315.

[2] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school or occupational settings, not including impairments due to physical or environmental limitations. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed.) (DSM–IV). A GAF score of 41 to 50 indicates the individual has serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or a serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 - 60 indicates moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

her dosage of Lexapro.[3]  AR 327-328.  Zevenbergen had therapy with Meister more regularly for a few weeks, but then abruptly stopped.  AR 332-336.  Zevenbergen's next medical appointments were medication checks with Nurse Stoos in April, August, and October of 2008.  Nurse Stoos noted no major changes during that time, and Zevenbergen's GAF score fluctuated between 50 and 60.  AR 337-344.  In October, Nurse Stoos increased Zevenbergen's dose of Lexapro and directed Zevenbergen to follow through with her therapy with Meister.  AR. 344.

Zevenbergen followed up with Meister on October 28, 2008.  Meister noted no diagnostic changes, and her notes indicate that most of the therapy session dealt with issues surrounding the custody of Zevenbergen's children.  AR 345.  On November 12, 2008, Zevenbergen told Nurse Stoos that her mood and affect were better since the increase in Lexapro dosage.  AR 348-349.  Nurse Stoos assigned a GAF score of 55.  *Id.*  Zevenbergen continued to attend therapy sessions with Meister through late 2008, without any serious change in her condition.  AR 350-355, 547-548.

Zevenbergen followed up with Nurse Stoos in January of 2009.  Nurse Stoos noted that Zevenbergen was stressed as result of the situation with her children.  AR 356-357.  Nurse Stoos assigned Zevenbergen a GAF score of 50 and again instructed her to follow through with her therapy commitments.  *Id.*  However, Zevenbergen did not follow up with Meister until March of 2009.  AR 359.  In that appointment, Meister assigned Zevenbergen a GAF score of 52 and noted continued issues with her depressive disorder.  AR 362.  Zevenbergen had a similar follow up appointment with Nurse Stoos two days later, where Stoos assigned Zevenbergen a GAF score between 50 and 55.  AR 364.  At her April 2009 medication check, Nurse Stoos assigned Zevenbergen a GAF score of 55

---

[3] The increased medication dosage seems to be related to the fact that Zevenbergen's children were placed in foster care by the Department of Human Services shortly before the October appointment.

and stated that Zevenbergen's primary issue remained the uncertain custody of her children. AR 366-367. In May, June, and July, 2009, Zevenbergen attended three therapy appointments with Meister and discussed being depressed because she did not have custody of her children. AR 368-375.

On July 15, 2009, Zevenbergen had a medication check with Nurse Stoos. Nurse Stoos assigned Zevenbergen a GAF score of 55, and noted that Zevenbergen's depression and stress were primarily related to the ongoing custody issue. AR 376. Zevenbergen requested an increased dose of Lexapro, which Nurse Stoos accommodated. *Id*. Zevenbergen reported to Nurse Stoos that she was working at the restaurant Arby's and that "she is doing well at work." *Id*. During her August, 2009, appointments with Meister, Zevenbergen discussed the status of her personal relationships and Meister noted that Zevenbergen seemed less depressed. AR 379. Zevenbergen also discussed issues related to her job at Arby's, specifically having a hard time dealing with criticism from her superiors. AR. 382, 524-525, 528. Zevenbergen then failed to attend her follow up appointments until October 27, 2009. On that date, she attended therapy with Meister, and reported that she had lost her job and was very depressed. AR 387. Meister encouraged Zevenbergen to look for work and stated, "this therapist encouraged [Zevenbergen] to apply at every place she can in order to increase her chances of getting a job. Cara was willing to do this and seemed motivated to do so following today's session." *Id*. On November 6, 2009, Zevenbergen again attended her therapy session. She reported she was living at the Gospel Mission, a local shelter. AR 389. Meister noted both depression and anxiety. *Id*. Zevenbergen followed up with Nurse Stoos a few days later, who assigned Zevenbergen a GAF score of 50, and began lowering her dosage of Lexapro and prescribed Mirtazapine as replacement anti-depressant. AR 391-391. At her medication check in December of 2009, Nurse Stoos assigned Zevenbergen a GAF score of 50 and prescribed her the ADHD medication Strattera. AR 397. At

her January, 2010, medication check, Zevenbergen told Nurse Stoos that she was doing "okay." AR 503. Nurse Stoos assigned Zevenbergen a GAF score of 55. AR 504.

In January and February, Zevenbergen attended regular therapy sessions with Meister. No diagnostic changes were noted, and the sessions primarily dealt with Zevenbergen's parental rights and living situation. AR 501-502, 506-507. Meister regularly encouraged Zevenbergen to apply for jobs. *Id*. On February 24, 2010, Meister reported that Zevenbergen was upset about being homeless. AR 498-499. Meister stated that, "[Zevenbergen] continues to struggle with depressive symptoms. She is currently staying with her ex, but will be homeless again soon. She has no money and no food. She is resistant to many ideas and approaches discussed in session." AR 499. On March 16, 2010, Meister reported that Zevenbergen's mood had improved and that Zevenbergen had voluntarily decided to give up her parental rights. AR 494. At a May 17, 2010, medication check, Zevenbergen told Nurse Stoos that she could not attend therapy because she missed too many sessions, but hoped to restart therapy in the near future. AR 488-489. Nurse Stoos noted Zevenbergen's depressive disorder was at a moderate degree, and assigned her a GAF score of 55. AR 489. At a therapy session on June 7, 2010, Meister noted that Zevenbergen was still struggling to find work and that she had a GAF score of 55. AR 430, 434. On June 14, 2010, Meister noted that Zevenbergen seemed happy, and Meister encouraged her to apply for jobs. AR 486-487. On July 16, 2010, Zevenbergen told Meister that she was doing well, but she could not find a job because she did not have a phone. AR 483-484. On August 25, 2010, Zevenbergen had a therapy session with Meister, who reported no significant changes. On October 22, 2010, Zevenbergen told Meister that she "wants to not dwell on the negatives" and hoped to get a job. AR 478. Significantly, Meister noted, "Cara shared that she [had] not made many attempts to find work. She shared she applied for disability and has been denied

three times. This therapist encouraged her to appeal her disability claim and to continue to look for work." AR 478.

On December 22, 2010, Zevenbergen presented to Physician's Assistant Patel Reddy for a psychiatric evaluation. AR 424. Reddy diagnosed Zevenbergen with bipolar disorder and mood disorder (along with her depressive disorder and anxiety disorder) and assigned her a GAF score of 55. AR 427. Reddy prescribed Zevenbergen Lithium to augment her other medications. AR 428. Zevenbergen then began having regular medication checks with Reddy. On February 3, 2011, Zevenbergen reported that she was "OK" and that she had a job at Goodwill. AR 472. Reddy reported that Zevenbergen had improved since December of 2010, and assigned her a GAF score of 65. AR 473. During the March 8, 2011, medication check, Zevenbergen told Reddy she quit taking the Lithium prescription but was otherwise in good spirits. AR 468. Reddy assigned Zevenbergen a GAF score of 70. AR 469. Zevenbergen appeared for a follow up appointment in April, 2011. Zevenbergen appeared more upset than she had in the past, possibly because she lost her job at Goodwill. AR 464. Reddy did not note any diagnostic change in her condition but assigned her a much lower GAF score of 55. AR 465. On May 24, 2011, Reddy noted Zevenbergen's failure to consistently take her medication and stated that Zevenbergen "takes medication 'whenever she remembers.'" AR 461. Reddy observed that Zevenbergen's conditions, anxiety disorder, depressive disorder, bipolar disorder, and mood disorder were all uncontrolled and assigned her a GAF score of 50. AR 462.

On September 1, 2011, Reddy's assessment of Zevenbergen was that her conditions were unchanged from May and assigned her a GAF score of 53. *Id*. Zevenbergen told Reddy that she was upset and appeared tearful, so Reddy prescribed Zevenbergen the mood stabilizing drug Depakote. AR 458. On October 13, 2011, Zevenbergen reported to Reddy that she was often tired and spent most of her time

watching television. AR 577. Reddy noted that Zevenbergen appeared rested and relaxed and assigned her a GAF score of 63. AR 578. On February 1, 2012, Zevenbergen told Reddy that she had discontinued several of her medications. AR 599. Reddy described Zevenbergen as calm and assigned her a GAF score of 59. AR 600. Reddy observed some improvement in Zevenbergen in her May 1, 2012, medication check, including plans to take a vacation, and assigned her a GAF score of 63. AR 596-597. Reddy assigned Zevenbergen the same GAF score on July 31, 2012. AR 594. On October 30, 2012, Zevenbergen stated that she was very depressed. Reddy observed no diagnostic changes, continued to note that Zevenbergen's depressive disorder was moderate, and assigned her a GAF score of 60. AR 589-592. At her next appointment in late November 2012, Zevenbergen appeared better and Reddy assigned her a GAF score of 64. AR 587-588.

After Zevenbergen filed her disability claim, Jennifer Ryan, Ph.D., conducted a record review at the behest of the agency. Dr. Ryan found that Zevenbergen's primary issue was major depressive disorder and concluded that, "[l]isting 12.04 was used for reference and while severe, impairment does not meet or equal listing severity . . . The preponderance of the evidence in the file supports the assertion that the claimant is able to follow simple instructions and perform simple, routine, repetitive work tasks, and she may function best in work environments with limited interpersonal demands." AR 404, 418. Additionally, Russell Lark, Ph.D., conducted a record review and determined that Zevenbergen had moderate limitations and that, "the preponderance of the evidence in the file indicates that claimant is able to complete simple, repetitive tasks on a sustained basis." AR 70-72, 80-89. Myrna Tashner, Ed.D., likewise did a records review. Tashner applied the 12.04(a)-(c) criteria, and found only mild to moderate mental limitations. AR 94-95. Tashner determined that Zevenbergen's medical history did not establish any of the listing criteria and stated that "[w]hile you are not capable of

performing work you have done in the past, you are able to perform work that is less demanding." AR 99-100.

### 3. *The ALJ's Findings*

The ALJ evaluated Zevenbergen's mental impairments as set in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). Applying the paragraph B criteria set out in 12.04, the ALJ found Zevenbergen's mental impairments were not severe within the meaning of the Act. AR 13-14. With regard to Zevenbergen's activities of daily living, the ALJ noted:

> In activities of daily living, the claimant has mild restriction. The claimant testified that her activities of daily living included getting up around 8:00 or 9:00 a.m., getting dressed, feeding the guinea pig, watching TV, and listening to music. She reported that she does not have a driver's license and walks places and that she and her boyfriend like movies, museums, and walks. In addition, function information completed by the claimant indicates that she is able to complete personal care and household tasks. She is able to go out alone, walk to the store, and talk on the telephone. (Exhibits 6E, 3F)

*Id*. With regard to social functioning, the ALJ concluded:

> In social functioning, the claimant has mild difficulties. Function forms completed by the claimant indicate that she is able to go out alone, walk to the store, and talk on the telephone. She reported some difficulty getting along with others and tries to avoid going places with large groups of people. However, when she was employed at Arby's it was noted that she was able to relate to supervisors and the public. (Exhibits 6E, 3F/3)

*Id*. With regard to pace, persistence, concentration and episodes of decompensation, the ALJ stated:

> With regard to concentration, persistence or pace, the claimant has moderate limitations that would limit her to

unskilled work.  The claimant completed function information alleging difficulty with her memory.  However, when the claimant worked at Arby's, it was noted that she had adequate performance in her work quality, understanding and carrying out simple (one- and two-step) instructions and procedures, concentrating and remaining on task, adapting to changes in the workplace, relating to supervisors, and relating to the public.  She required only occasional supervision.  (Exhibits 6E, 3F/3)

The claimant has not had repeated episodes of decompensation of extended duration; that is, she has not had three episodes of decompensation within one year, or an average of one episode every four months, each lasting at least two weeks. She has not had episodes of decompensation that were equal in duration or functional effects to "repeated" episodes of decompensation.

AR 13-14.  The ALJ concluded that, "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied."  AR 14.

### 4.    Analysis

Zevenbergen's first alleged error is that the ALJ failed to properly assess the severity of her mental impairments.  In doing so, Zevenbergen argues that "the ALJ relied upon the State Agency's doctors rather than her treating sources. The State Agency's medical consultants who did not examine the Claimant but only reviewed the medical records were given "substantial weight because they were accepted medical sources and their opinions are consistent with the record as a whole. . ."  Zevenbergen argues that had the opinions of her treating sources been given the deference they deserved, the ALJ's conclusion regarding her mental impairments would have been different.

It is beyond dispute that treating practitioners have the clearest insight into the medical conditions at issue in social security disability cases. As has been repeatedly stated:

> [t]he opinion of a treating physician: should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); see also 20 C.F.R. §404.1527(c)(2) and *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005). "'Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight.' *Samons v. Astrue,* 497 F.3d 813, 818 (8th Cir.2 007)." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015). *See also* SSR 96-5p and 20 C.F.R. §404.1527(c)(2). The ALJ must "always give good reasons . . . for the weight [he gives the] treating source's opinion." 20 C.F.R. §404.1527(c)(2), *Singh*, 222 F.3d at 452. In the decision's narrative discussion section, the ALJ "must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p. Additionally, the opinions of an examining physician should be given greater weight than the opinions of a source who has not examined the claimant. *See Shontos v. Barnhart*, 328 F.3d 418, 425 (8th Cir. 2003), *citing* 20 C.F.R. § 404.1527(d)(1) (now 20 C.F.R. §404.1527(c)).

As discussed above, according to the medical records that have been made part of the record in this case, Zevenbergen had three primary care providers: Nurse Stoos; P.A. Reddy; and therapist Meister. However, those three are not acceptable medical sources. Under the regulations, a physician or a psychologist is an "acceptable medical source." 20 C.F.R. § 404.1513(a)(1)-(5). Only an acceptable medical source can

establish the existence of a medically determinable impairment. 20 C.F.R. §§ 404.1513(a)(1)-(5), 416.913(a)(1)-(5). The Eighth Circuit Court of Appeals has given explicit instruction regarding the weight given to other sources:

> [o]n August 9, 2006, the SSA issued Social Security Ruling (SSR) 06-03p, 71 Fed. Reg. 45,593 (Aug. 9, 2006). The ruling clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources." Social Security separates information sources into two main groups: acceptable medical sources and other sources. It then divides other sources into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. §§ 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, *id.*, (2) only acceptable medical sources can provide medical opinions, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007), and (3) only acceptable medical sources can be considered treating sources, 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007). Other sources: Medical sources include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. Non-medical sources include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007). "Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-03p. "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may

> provide insight into the severity of the impairment(s) and how
> it affects the individual's ability to function."

*Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007). The *Sloan* Court went on to say, "[i]n general, according to the ruling, the factors for considering opinion evidence include: [h]ow long the source has known and how frequently the source has seen the individual; [h]ow consistent the opinion is with other evidence; [t]he degree to which the source presents relevant evidence to support an opinion; [h]ow well the source explains the opinion; [w]hether the source has a specialty or area of expertise related to the individual's impairment(s); and [a]ny other factors that tend to support or refute the opinion." *Sloan*, 499 F.3d at 889.

Because Zevenbergen's primary providers are not acceptable medical sources, their conclusions regarding her diagnosis cannot be given controlling weight. However, I can credit their opinions to the extent those opinions are consistent as set out in the *Sloan* case. However, regardless of what weight I give those opinions, Zevenbergen cannot prevail, because the notes of her primary care providers do not show what she alleges. In fact, as stated in the ALJ's ruling, "[a]s provided by SSR 06-3p, the undersigned has given great weight to the opinions of Ms. Meister, Ms. Stoos, and Mr. Reddy. These sources are not acceptable medical sources, but they are examining sources, and their opinions are entitled to weight, as provided by SSR 06-3p. The opinions are based on clinical findings, are consistent with each other, and are consistent with other substantial medical evidence of record." AR 23.

The provider notes in the record, and summarized above, do not reveal any information that is different from or contrary to the ALJ's decision. Zevenbergen was generally non-compliant with her providers. She repeatedly skipped appointments, sometimes for months at a time. She would spontaneously discontinue taking medication. She was often difficult in her appointments and refused to accept advice. In spite of those

issues, Zevenbergen's afflictions were almost always listed as 'moderate.' Her GAF scores were steady between 50 and 60, and actually began to improve as time went by. Once Zevenbergen lost her parental rights and began to have her medication checked by P.A. Reddy, she repeatedly posted GAF scores of 60 or above. In their normal examination notes, none of her providers opined that Zevenbergen was unable to work. In fact, they all, but especially Meister, encouraged Zevenbergen to obtain employment throughout the course of her treatment.

In her ruling, the ALJ meticulously recounts Zevenbergen's medical history. Rather than discount the opinions of her primary care providers, the ALJ relied upon those treatment notes to show that over the course of many years, Zevenbergen's symptoms were steady in the mild to moderate range. AR 16-22. Those treatment notes augment the conclusions reached by the consulting medical sources who found Zevenbergen's limitations to be either moderate or mild. AR 94, 83, 411, and 417. Neither in her brief, nor in her argument before Judge O'Brien, did Zevenbergen point to any medical record that would tend to show her limitations in social functioning, pace, concentration, persistence, and pace were 'marked.' Rather, as will be discussed more below, the record is full of references to Zevenbergen's social life, her friends and boyfriends, and her ability to perform average activities.

Additionally, Zevenbergen argues the ALJ should not have relied on the opinion of Russell Lark, Ph.D., because he rendered his conclusion prior to P.A. Reddy's treatment of Zevenbergen, and P.A. Reddy's determination that Zevenbergen suffered from uncontrolled bi-polar disorder. However, as argued by the Defendant, "Plaintiff misunderstands Dr. Lark's report, which the Commissioner solicited in connection with plaintiff's Title II claim (Tr. 69-78). Plaintiff's Title II eligibility ended on her date last insured, September 30, 2011 (Tr. 12). Therefore, Dr. Lark's October 19, 2011 report, Exhibit 2A, did not go beyond this date (Tr. 69-78). Dr. Lark's second October 18,

2011 report, Exhibit 4A, was for plaintiff's Title XVI claim (Tr. 80-89). A reading of both reports shows that Dr. Lark relied on the entirety of plaintiff's treatment record. . . ." docket no. 14, p. 8-9.

In short, the ALJ's determination that Zevenbergen had only 'mild' limitations in social functioning, and only moderate limitations in pace, persistence, and concentration are supported by substantial evidence in the record. Those determinations are not only consistent with and supported by the opinions of the state agency experts, they are supported by the medical record supplied by Zevenbergen's primary care providers.

## B. *Evaluation of Subjective Allegations*

### 1. *Applicable Standards*

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). Accordingly, the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole. *Id.*

To determine a claimant's credibility, the ALJ must consider:

    (1)    the claimant's daily activities;

    (2)    the duration, intensity, and frequency of pain;

    (3)    the precipitating and aggravating factors;

    (4)    the dosage, effectiveness, and side effects of medication; and

    (5)    any functional restrictions.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). "'Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's

credibility.'" *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001)). However, the Eighth Circuit Court of Appeals has repeatedly stated that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." *Hogg v. Shalala*, 45 F.3d 276, 278-79 (8th Cir. 1995) (citing *Harris v. Sec'y of Dep't of Health and Human Servs.*, 959 F.2d 723, 726 (8th Cir. 1992)). A claimant need not prove she is bedridden or completely helpless to be found disabled. *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005). Yet, the Eighth Circuit Court of Appeals has also held that "cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009).

With respect to determining whether activities of daily living are inconsistent with subjective complaints of disability, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others over a period of time and the frequency, appropriateness, and independence of the activities." *Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007) (citing *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007)). "Other relevant factors include the claimant's relevant work history, and the absence of objective medical evidence to support the complaints." *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (quoting *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). An ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence, *Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010), but such evidence is one factor that the ALJ may consider. *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008). The ALJ need not explicitly discuss each factor as long as the ALJ acknowledges and considers the factors before discounting the claimant's subjective complaints. *Goff*, 421 F.3d at 791. "An ALJ who rejects [subjective] complaints must make an express credibility

determination explaining the reasons for discrediting the complaints." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

When an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the court should normally defer to the ALJ's credibility determination. *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). It is not my role to re-weigh the evidence. *See* 42 U.S.C. § 405(g); *see also Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) ("[I]f, after reviewing the record, [the Court] find[s] that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the Court] must affirm the decision of the Commissioner.") (citations and quotations omitted). However, in reviewing the ALJ's credibility determination I must consider the evidence that both supports and detracts from the ALJ's decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012) (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). It is not appropriate to reverse the ALJ's decision simply because some evidence would support a different conclusion. *Perks*, 687 F.3d at 1091. An ALJ is not required to discuss every piece of evidence that was submitted, and an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). I must defer to the ALJ's determination regarding the credibility of testimony as long as it is supported by good reasons and substantial evidence. *Id.* (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)).

### 2. *The ALJ's Findings*

At her hearing before the ALJ, and throughout the course of the disability application process, Zevenbergen maintained that because of her depressive disorder she

is unable to return to work.[4]  AR 51, 54.  The ALJ found that Zevenbergen's statements concerning the intensity, persistence, and limiting effects of her symptoms from her mental impairments were not entirely credible.  After referencing the *Polaski* factors and examining some of the medical and opinion evidence, the ALJ found that:

> [a]fter considering the evidence of record, the undersigned finds the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

AR 16.  The ALJ found inconsistencies in the record, stating:

> [t]he claimant testified that she was disabled due to ADHD.  She has been treated by Dr. Patel for a couple years, but he took her off her ADHD medications.  The claimant stated that Dr. Patel advised her to apply for disability benefits due to her difficulties with anxiety, depression, and mood swings.  In 2011, the claimant reported that her diagnosis was changed to bipolar disorder and Depakote was added.  The claimant acknowledged that she only sees a physician's assistant and has not seen a therapist in several years with no therapy since her kids were removed.  She noted that she missed too many appointments with her therapist.

AR 16.  The ALJ also noted the non-compliance with the medical directives, discussed above, stating:

> [i]n terms of the claimant's alleged bipolar disorder, depressive disorder, anxiety disorder, and history of alcohol abuse, the undersigned finds that the credibility of the claimant's statements regarding her functional limitations related to her mental medically determinable impairments are partially eroded by her non-compliance (e.g., missing

---

[4] During the hearing, Zevenbergen also testified that she was disabled based on her ADHD.  That allegation is not supported by anything in the record.

appointments, not taking medications as prescribed) with treatment. (Exhibits 6A, 8A, 1F/14, 1F/44-66, 5F/46-48, 5F/50-60, 5F/66-75, 5F/109-126) In addition, the claimant reported to Mr. Reddy that her children were adopted because of her past history of drug abuse and life style. (Exhibit 9F/6) It was noted that at the hearing, the claimant testified that she never used marijuana. She reported that she was not drinking with her kids, but her life style was more focused on her happiness than her kids. In addition, the claimant testified that she did not get clean until 2011.

AR 22. Another important credibility factor discussed by the ALJ was Zevenbergen's work history:

> [i]t is noted that the claimant has been applying for disability benefits since 2004, due to ADHD, but was not on any medications for that impairment. This is her [fourth] application. A review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments. However, after the claimant lost custody of her two boys in 2008, her boyfriend said she needed a job so she worked at Arby's from December 17, 2008 through October 2009, and was terminated due to missing work. Also, after her parental rights were terminated in 2010, she worked at Goodwill Industries from January 2011 through March 2011. (Exhibits 1E, 17E, 14E, 3F/3) Upon reviewing the evidence of record, it is noted that the claimant's allegedly disabling impairments were present at approximately the same level of severity during the periods that she worked. The fact that the impairments did not prevent the claimant from working at that time strongly suggests that it would not currently prevent her from working. It was also noted that the claimant stopped working for reasons not related to the allegedly disabling impairments, as she missed work. In addition, at the hearing, the claimant testified that she was not looking for work currently and did not have plans to work again.

> The prior file shows a Work Performance Assessment for [her] position as a fast food cashier at Arby's from December 2008 to October 2009, reporting poor performance in pace, ability to follow complex instructions, attendance, judgment, general appearance, ability to relate to co-workers, and ability to manage stress. However, the claimant had adequate performance in her work quality, understanding and carrying out simple (one- and two-step) instructions and procedures, concentrating and remaining on task, adapting to changes in the workplace, relating to supervisors, and relating to the public. She required only occasional supervision. The claimant was fired for missing work and was not eligible for rehire due to reliability issues. (Exhibit 3F/3)

AR 22. Finally, the ALJ noted that Zevenbergen is capable of sustaining an independent lifestyle. She can follow written instructions, go to the store, maintain her home, and take care of her personal care needs. AR 23.

### 3. Analysis

Zevenbergen argues the ALJ failed to properly consider her subjective allegations. In doing so, she makes three main points. First, she argues that the ALJ failed to articulate reasons for finding her statements less than totally credible. Second, she argues the ALJ's opinion contained a factual error regarding why she was terminated from one of her prior restaurant jobs. Finally, she argues that the ALJ improperly discounted the third party report of her boyfriend. The Commissioner, obviously, disagrees, and argues that the ALJ's ruling is supported by substantial evidence.

Based on my review of the record, I conclude that, for the most part, the ALJ gave detailed reasons for discounting Zevenbergen's subjective complaints and limitations. The ALJ gave at least four separate reasons why Zevenbergen's claim that she is completely incapable of work is not supported by the record. The ALJ discussed Zevenbergen's activities of daily living and noted that she engaged in many activities that do not support her claims of disabling pain. AR 23. Zevenbergen does not have a

driver's license and does not drive. Otherwise, in the period of years covered by this record, she was able to take care of her personal care needs. She maintained various homes, engaged in a series of romantic relationships, had a pet, fed herself, and went to the store. She also stated she enjoyed watching television, listening to music, going for walks, and going to the movies. The Eighth Circuit Court of Appeals has stated that the claimant's ability to perform basic life functions can be a factor considered by the ALJ in determining if the claimant's allegations are credible. *See Baker v. Barnhart*, 457 F.3d 882, 893 (8th Cir. 2006) (the Eighth Circuit Court of Appeals considered the fact that the claimant was capable of full self-care, drove a car every day, shopped, and ran a number of errands as one factor in determining if claimant's allegations were credible). However, a "limited ability to complete light housework and short errands does not mean [a claimant] has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" *Tilley v. Astrue*, 580 F.3d 675, 682 (8th Cir. 2009) citing *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc) *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000). In this case, the ALJ properly considered Zevenbergen's ability to perform basic life tasks as one factor in determining if her allegations were credible.

The ALJ also noted Zevenbergen's non-compliance with medication and medical directions. As can be seen in the review of the medical records set out above, there is no possible factual dispute that Zevenbergen was non-compliant with medical direction. On several occasions, she stopped taking prescribed medication without consulting her treating providers. Her therapy sessions were normally scheduled weekly or bi-weekly; she would often go months without attending an appointment. The Eighth Circuit Court of Appeals has recognized that non-compliance can be a basis for discounting a claimant's

credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007). Accordingly, the ALJ properly used it as one factor that weighed against Zevenbergen's credibility.

The ALJ also cited Zevenbergen's work history. Specifically, the ALJ noted that Zevenbergen had a poor work history even prior to the alleged onset date, and that she continued to work, sporadically, even after filing for benefits. This finding is supported by the record. Zevenbergen testified that she worked sporadically at restaurants and Goodwill prior to her alleged onset date. AR 42-48. She often left her jobs for reasons unrelated to her alleged disability. AR 46-47 (Zevenbergen quit a job at Perkins because she did not like her co-workers and got fired from Burger King for taking an unscheduled day off to be with her children.) That did not change after the alleged onset date. Zevenbergen worked at Arby's in 2009. She testified that she got fired from Arby's for taking unapproved time off for a class reunion. AR 48. The Eighth Circuit Court of Appeals has recognized that a poor work record prior to the alleged onset date can be a factor tending to show the claimant lacks motivation to work. *Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004) (the ALJ properly considered claimant's poor work history and low earnings as a credibility factor).

Additionally, as was discussed in some detail in the previous section, the ALJ stated that the medical record did not support Zevenbergen's allegations. AR 23. None of the providers appearing in the record ever opined that Zevenbergen was completely disabled. Even Zevenbergen's own treatment providers repeatedly encouraged Zevenbergen to look for work. It is not my job to reweigh the evidence. Rather, the question is whether the ALJ gave good reasons for her opinion and whether the opinion is supported by substantial evidence. In this case, the ALJ gave at least four clear reasons, which are supported by citations to the record, which tend to show that the claimant's subjective allegations were not credible. Accordingly, the ALJ's finding is supported by substantial evidence.

Zevenbergen also points to an alleged factual error in the ALJ's opinion, regarding Zevenbergen's work performance at Arby's. Zevenbergen argues that the ALJ gave a contradictory explanation about why Zevenbergen was fired by Arby's. In her opinion, the ALJ cites a work performance review from Arby's which stated that Zevenbergen had poor performance in some areas, but adequate performance in other areas. The ALJ then stated that, "claimant was fired for missing work and was not eligible for rehire due to reliability issues." Zevenbergen argues that it is a contradiction for the ALJ to state that Zevenbergen had (some) poor work performance, but then say that she was terminated for absenteeism. However, the ALJ's statements are supported by the record, including Zevenbergen's own testimony about why she was fired from Arby's. AR 48. Accordingly, there is no contradiction or factual error in the ALJ's report.

Finally, Zevenbergen argues that the ALJ should have given greater weight to the third party report provided by Zevenbergen's boyfriend. Zevenbergen's boyfriend, Fredrick Blowe, stated that Zevenbergen was scared to be alone, needs help with many basic functions, often gets nervous and does not handle change well. AR 228-234. The ALJ gave Blowe's testimony little weight, stating:

> [s]imilarly, the undersigned has not given great weight to the written statement of Mr. Blowe. Out of natural concern and devotion, it is not uncommon for a boyfriend to place unreasonable limitations on the daily activities of a loved one, or to attribute even ordinary changes in mood to an impairment, whenever illness or injury occurs. Clearly, Mr. Blowe is genuinely concerned about the claimant's well-being; however, his implicit allegation that the claimant is disabled is subject to the considerations noted above regarding the claimant's own testimony. In addition, it is noted that Mr. Blowe is on disability for a bipolar disorder and has a financial incentive since he is helping the claimant with finances.

AR 16. Although Blowe's statements generally supported Zevenbergen's subjective allegations, the ALJ was entitled to discount Blowe's corroborating testimony for the

same reason used to discredit Zevenbergen, as Blowe has close relationship to Zevenbergen, resided with and helped care for Zevenbergen, and has a financial interest in a disability finding. *See Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 2006) (ALJ's failure to give specific reasons for disregarding testimony of the claimant's husband was inconsequential, as the same reasons the ALJ gave to discredit claimant could serve as basis for discrediting the husband). The ALJ provided detailed reasons for her credibility findings, and those findings are substantially supported by the medical evidence. Accordingly, I must deny Zevenbergen's argument.

### C. *Hypothetical Question to the Vocational Expert*

#### 1. *Applicable Standards*

"A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments." *Buckner v. Astrue*, 646 F.3d 549, 560–61 (8th Cir. 2011). "[T]he hypothetical need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the concrete consequences of those impairments." *Id.* (quoting *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010)).

#### 2. *The question*

The ALJ based the first hypothetical on her assessment that Zevenbergen could return to her past relevant work. The ALJ asked, "first hypothetical, there is no physical impairment. Mental only. SVP 1, 2. Routine, repetitive work. Does not require extended concentration or attention; not deal with goal setting or job changes. And then social interaction could be brief, superficial, occasional. But I would like you to consider jobs that avoid intense or request social interaction with coworkers and the public. With that functional capacity, hostess is precluded . . . for that job can you indicate how many

exist in the nation or the region?"[5]  AR 63-64.  The VE answered, "[i]n the national, there are 1,103, 0114; and in Nebraska there are 6937.  And in the four state region of Iowa, Nebraska, Missouri, and Kansas there are approximately 25,000."  AR 64.  The ALJ asked a second hypothetical based on Zevenbergen's same limitations, but assuming that she could not return to past relevant work.  Under that condition, the VE testified that there would be 5,011 jobs available for Zevenbergen in the four state area.  AR 64-65.

### 3.    *Analysis*

Zevenbergen makes two arguments regarding the hypothetical questions, neither of which are well developed in her brief.  First, Zevenbergen argues that the hypothetical failed to include certain impairments, including fibromyalgia.  As the Commissioner pointed out in its brief, "Plaintiff provided no evidence to support her claim that she had fibromyalgia.  *See* Pl. Br. at 15.  Therefore, the ALJ did not have to account for fibromyalgia in the hypothetical question.  *See Howe v. Astrue*, 499 F.3d 835, 842 (8th Cir. 2007)."  docket no. 14, p. 13.  Indeed, in all of the medical records provided in this case, there is no discussion of a fibromyalgia diagnosis.  There was no reason for the ALJ to include fibromyalgia in the hypothetical questions.

Second, Zevenbergen argues that the hypothetical was defective, because it did not include Zevenbergen's self-described limitations.  In the preceding section, I found that the ALJ's determination regarding Zevenbergen's subjective complaints was supported by substantial evidence.  Accordingly, the ALJ correctly omitted Zevenbergen's subjective limitations from the hypothetical and instead relied upon the medical evidence of record.  I find no error in the question posed by the ALJ.

---

[5] The ALJ and vocational expert had a side conversation about whether that description would include cashier jobs.  They determined that it would.  AR 64.

### VI.    CONCLUSION

After a thorough review of the entire record and in accordance with the standard of review I must follow, I conclude that the ALJ's determination that Zevenbergen was not disabled within the meaning of the Act is supported by substantial evidence in the record.  Accordingly, the decision of the ALJ is **affirmed**.  Judgment shall be entered in favor of the Commissioner and against Zevenbergen.

**IT IS SO ORDERED.**

**DATED** this 15th day of September, 2015.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA